# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 11-1248

GAIL SAMPSON

VERSUS

AVOYELLES PARISH SCHOOL BOARD

**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT 2
PARISH OF AVOYELLES, NO. 10-5140
JAMES L. BRADDOCK, WORKERS' COMPENSATION JUDGE

**********

## ELIZABETH A. PICKETT
## JUDGE

**********

Court composed of Jimmie C. Peters, Elizabeth A. Pickett, and James T. Genovese, Judges.

## AFFIRMED IN PART AS AMENDED; REVERSED IN PART; AND RENDERED.

Eugene A. Ledet, Jr.
Dalrymple & Ledet, LLC
P. O. Drawer 14440
Alexandria, LA 71315
(318) 442-1818
Counsel for Plaintiff-Appellee:
    Gail Sampson

**Stacy C. Auzenne**
**Auzenne Law Firm, L.L.C.**
**P.O. Box 11817**
**Alexandria, LA 71315-1817**
**(318) 880-0087**
**Counsel for Defendant-Appellant:**
    **Avoyelles Parish School Board**

**PICKETT, Judge.**

Employer appeals four awards of penalties and attorney fees to workers' compensation claimant. We affirm as amended, reverse in part, and render.

## FACTS

On November 11, 2006, Gail Sampson tripped and fell on the strap of a student's backpack while employed by the Avoyelles Parish School Board (APSB). When she fell, Ms. Sampson injured her knees and her left shoulder. The APSB began paying her indemnity benefits and her medical expenses.

Beginning in 2009, issues arose with regard to the APSB's refusal to authorize: (1) the refill of a prescription for Savella, a treatment for fibromyalgia; (2) a prescription for Amitiz, a treatment for constipation; (3) an MRI of Ms. Sampson's left knee; and (4) Ms. Sampson's request to seek treatment from a second orthopedic physician. Ms. Sampson filed a Disputed Claim for Compensation (1008), seeking medical treatment, her choice of a physician, and penalties and attorney fees for the APSB's refusal to authorize the requested medical treatment.

After a trial, the workers' compensation judge (WCJ) determined the APSB did not reasonably controvert Ms. Sampson's claims and awarded her four $2,000 penalties and attorney fees in the amount of $7,500. The APSB appealed; Ms. Sampson answered the appeal, seeking an additional award of attorney fees for worked performed by her attorney on appeal.

## ASSIGNMENTS OF ERROR

The APSB assigns as error:

1) The WCJ committed manifest, reversible error when it awarded Ms. Sampson a penalty of $2,000 for failure to pay for the medication,

Savella, when this medication was prescribed solely to treat fibromyalgia, a condition that pre-existed her job accident.

2) The WCJ committed manifest, reversible error when it awarded Ms. Sampson a penalty of $2,000 for failure to pay for the constipation medication, Amitiza, when constipation medications had been prescribed pre-accident.

3) The WCJ committed manifest, reversible error when it awarded Ms. Sampson a penalty of $2,000 for failure to authorize a change in the choice of orthopedic surgeon, when her first choice had discharged her because she presented no objective symptoms or evidence of pain.

4) The WCJ committed manifest, reversible error when it awarded Sampson a penalty of $2,000 for failure to authorize an MRI prescribed by a nurse practitioner, when the MRI was found not medically necessary by her treating orthopedic surgeon and a second medical opinion orthopedist.

5) The WCJ committed manifest, reversible error when it ordered the APSB to pay attorney fees in the amount of $7,500, court costs, and legal interest when no evidence was offered regarding the time spent on the case or the work done to earn the attorney fees.

## DISCUSSION

### Penalties and Attorney Fees

When an employer refuses to authorize medical treatment for an eligible workers' compensation claimant, the claimant is entitled to penalties and attorney fees unless the employer reasonably controverts the claim. La.R.S. 23:1201(F); *Leonards v. Carmichael's Cashway Pharmacy, Inc.,* 09-1424 (La.App. 3 Cir. 5/5/10), 38 So.3d 571, *writ denied*, 10-1738 (La. 10/29/10), 48 So.3d 1094. A claim is reasonably controverted if the employer establishes that it had "some valid reason or evidence" for denying the claim. *Trahan v. City of Crowley*, 07-266, p. 5 (La.App. 3 Cir. 10/3/07), 967 So.2d 557, 561, *writs denied*, 07-2462, 07-2471 (La. 2/15/08), 976 So.2d 185, 187, respectively. Penalties are stricti juris. Accordingly, they should only be imposed when the evidence shows the employer's refusal to

authorize medical treatment was without just cause and not in good faith. *Mouton v. Gulfstream Servs.,* 08-1186 (La.App. 3 Cir. 5/6/09), 11 So.3d 1135.

Awards of penalties and attorney fees by a WCJ are subject to the manifest error/clearly wrong standard of review. *Ducote v. La. Indus., Inc.*, 07-1536 (La.App. 3 Cir. 4/2/08), 980 So.2d 843.

### *Savella Prescription*

Prior to her fall, Ms. Sampson had been diagnosed with fibromyalgia for which she had been treated for over ten years. The APSB contends the WCJ's award of a penalty for its refusal to authorize refills of Ms. Sampson's prescription for Savella is manifestly erroneous because it was prescribed for the "treatment of [her] pre-existing fibromyalgia . . . [which is] totally unrelated to the 2006 Bunkie Elementary accident." The APSB also asserts the prescription was properly denied because Ms. Sampson was unable to take the prescription due to nausea. These arguments ignore the fact that an employer takes his employee as he finds him, i.e., he is responsible for the aggravation of an employee's pre-existing condition caused by an on the job accident. *Lynch v. A Door Works, Inc.*, 11-414 (La.App. 3 Cir. 10/5/11), 72 So.3d 1033, *writ denied*, 11-2457 (La. 1/13/12), ___So.3d ___.

In an attempt to support these claims, the APSB references the deposition and records of Dr. Miguel Garcia, who treats Ms. Sampson for fibromyalgia. Contrary to its arguments, the referenced evidence supports the WCJ's finding. Dr. Garcia explained in his deposition that he had treated Ms. Sampson for more than ten years for fibromyalgia and that in 2006, her condition had improved to the extent that she was able to return to work at Bunkie Elementary. Dr. Garcia further explained, however, that Ms. Sampson's improvement was short lived, as "she had an exacerbation of her fibromyalgia" after she tripped and fell at the school.

With regard to Ms. Sampson's ability to tolerate Savella, Dr. Garcia testified that Ms. Sampson began taking Savella on July 28, 2009, and that a prescription for the medication issued to her on October 15, 2009, was not authorized to be filled. Dr. Garcia testified that Ms. Sampson discontinued the Savella because she "couldn't do it anymore" but that did not occur until October 28, 2010.

The APSB asserted in correspondence to Ms. Sampson's attorney that her requests for refills of Savella were properly denied because any exacerbation of fibromyalgia "should have settled down" at the time the requests were made. This assertion was disproved by the APSB's own adjustor, Katie Hart, who acknowledged that she did not possess any medical documentation or medical opinion that the exacerbation of Ms. Sampson's fibromyalgia had or "should have settled down" when the request was made. Accordingly, this assignment lacks merit.

### Amitiza Prescription

The APSB next argues the WCJ's award of a penalty for its failure to approve refills of a prescription for Amitiza, a medication for constipation, constitutes manifest error because Ms. Sampson had been prescribed narcotic pain medication which is known to cause constipation, as well as constipation medication prior to her fall.

Dr. Stephen Katz, a pain specialist who treated Ms. Sampson for the pain in her knees and left shoulder, prescribed Amitiza in June 2009. During his treatment, Dr. Katz prescribed some of the same pain medications Dr. Garcia prescribed for Ms. Sampson as treatment her for fibromyalgia. Dr. Katz's medication regimen differed from Dr. Garcia's, however, in that he prescribed higher daily doses of narcotic pain medications than Dr. Garcia prescribed and

often adjusted the combinations and doses of the medications he prescribed. In light of this evidence, the fact that Ms. Sampson was prescribed narcotics which can cause constipation prior to her fall and medication to relieve such constipation is not a valid reason for not authorizing the Amitiza prescribed by Dr. Katz. This assignment lacks merit.

### Knees−Second Opinion and MRI

The APSB assigns error with the WCJ's awards of penalties for its refusal to authorize Ms. Sampson to seek treatment with a second orthopedist and refusal to authorize an MRI recommended by a nurse practitioner. It contends the refusals were justified because Dr. David Pope, her treating orthopedist, and Dr. Gordon Mead, an orthopedist who rendered a second medical opinion at its request, opined that she had reached maximum medical improvement (MMI) in April 2009.

Dr. Garcia recommended an MRI of Ms. Sampson's left knee in October 2009, but the APSB would not authorize it. Then, in December 2009, Ms. Sampson sought treatment at a walk-in clinic for her knee pain. The nurse practitioner who examined her ordered an MRI which Ms. Sampson had performed.[1] After reviewing the MRI report which identified chondromalacia in Ms. Sampson's left knee, the nurse practitioner recommended that Ms. Sampson be evaluated by Dr. Louis Blanda, another orthopedic surgeon who had previously treated Ms. Sampson. Dr. Garcia agreed with the recommendation.

The APSB points to Dr. Pope's testimony that in November 2008, Ms. Sampson "was basically back to baseline" with regard to her knee pain, asserting the phrase referenced her status before the fall. This excerpt misrepresents Dr. Pope's testimony, which was: "[I]n November 2008, she was

---

[1] The MRI was paid for by Medicare.

5

basically back to baseline with . . . recurrence and continued pain . . . at the level she had prior to the injection therapy." The injection therapy referenced by Dr. Pope was therapy ordered by him after Ms. Sampson's fall. Hence, his testimony shows that the steroid injections in each of Ms. Sampson's knees provided her only temporary relief from her knee pain and that the baseline he referenced was not pre-fall as represented by the APSB.

Nonetheless, Dr. Pope felt there was no other treatment he could provide Ms. Sampson that would relieve her knee pain. He last saw her in April 2009. At that time, he felt her left shoulder was status quo, but she used a cane for walking and complained of achiness in her knees when she stood up or sat down. He referred her to Dr. Katz for pain management.

Dr. Pope testified in his deposition that he did not disagree with Dr. Mead's opinion that Ms. Sampson had reached MMI, explaining that after Dr. Mead's second opinion, he felt "our hands were tied." As a whole, Dr. Pope's testimony shows that because the December 2009 MRI of Ms. Sampson's left knee did not show the need for surgical repair and because the APSB would not authorize any additional physical therapy, he had nothing else to offer her. Because he and Dr. Mead were of the same opinion, Dr. Pope did not believe a referral to another orthopedist would benefit Ms. Sampson or that additional testing would benefit her. Dr. Pope reviewed the December 2009 MRI report and testified that it did not change his mind that surgical intervention would not help Ms. Sampson.

Dr. Mead examined Ms. Sampson on May 7, 2008, and November 17, 2008, for a second opinion regarding her orthopedic status. At the November 17, 2008 examination, Dr. Mead felt Ms. Sampson's complaints were not warranted by her orthopedic condition. As to her knees, he observed that "she walked without

difficulty and got up on and down off the examining table without any apparent difficulty" but "complained of a lot [of] trouble getting up and down." On examination, Ms. Sampson did have popping in her knees when she flexed or extended her knees; however, Dr. Mead explained that popping does not mean "anything" and that "a lot of people's knees pop." He also observed that she did not have popping on flexion or extension of her knees when he examined her on May 7, 2008.

Counsel for the APSB questioned Dr. Mead about the results of Ms. Sampson's December 2009 MRI, specifically chondromalacia. Dr. Mead explained that chondromalacia is the "softening of the cartilage under the kneecap, or in a joint" which "can cause a popping sensation." He continued, stating: "a lot of people feel that it can cause pain, but there's no obvious mechanism to explain why it causes the pain" because "there are no nerve endings in cartilage and cartilage does not have sensation." According to Dr. Mead, arthroscopy does not help chondromalacia unless the patient has locking symptoms, which Ms. Sampson did not have, and it does not relieve pain.

After examining Ms. Sampson, Dr. Mead was of the opinion that most of her problems at that time stemmed from depression and fibromyalgia. In his view, "her complaints were way out of proportion to what [he] would normally see in people who have these two problems, shoulder and knees. It just seemed kind of over the top." He thought Ms. Sampson's complaints warranted pain management and treatment for chronic depression, but he did not believe her left shoulder or knee complaints warranted additional physical therapy or orthopedic treatment. Dr. Mead opined that Ms. Sampson had reached maximum medical improvement as to her left shoulder and her knees and that she could return to work with

restrictions on standing, walking, squatting, climbing, lifting, and work above shoulder level.

In addition to chondromalacia, the December 2009 MRI of Ms. Sampson's left knee showed "Chondral fissuring of the patellar ridge with subchondral cyst formation and reactive marrow changes." Dr. Garcia opined in a note dated August 11, 2010, that based on the 2009 MRI and continued problems with her left knee, Ms. Sampson should see an orthopedic surgeon to "look into" the possibility of arthroscopic surgery on her left knee. He also testified in his December 2010 deposition that changes shown on the MRI are changes that can cause pain. Notwithstanding, he went on to testify: "If you have it or I have it, it will be, oh, my knee bothers me. In a patient who has significant fibromyalgia with significant supratentorial disabilities and psychological disabilities it may be just like if you had bone against bone."

We have considered the WCJ's reasoning for finding the APSB did not controvert Ms. Sampson's claim that it should have paid for the MRI of her left knee and allowed her to seek treatment with another orthopedic surgeon in light of the testimonies of Drs. Pope, Mead, and Garcia, as well as Dr. Garcia's August 11, 2010 note. As reflected above, Dr. Garcia's December 2010 testimony could be interpreted as echoing Dr. Mead's testimony that Ms. Sampson's continuing knee complaints were probably related to her fibromyalgia and continuing depression.

Drs. Garcia's and Mead's testimonies establish that Ms. Sampson's fibromyalgia complicated these issues. Importantly, Dr. Garcia's testimony supported Dr. Mead's opinion that Ms. Sampson's continued complaints of pain were related to her fibromyalgia and did not warrant additional orthopedic treatment. We are mindful that Dr. Garcia is Ms. Sampson's treating physician,

but he is not an orthopedist.  Dr. Pope is an orthopedist and was also Ms. Sampson's treating physician for her left shoulder and knees.  Therefore, we find the WCJ committed manifest error in concluding the APSB did not reasonably controvert the need for an MRI and an orthopedic consult and reverse the awards of penalties for the APSB's refusal to authorize these requests.

Our reversal of these penalties is not a reversal of the WCJ's conclusion that Ms. Sampson is entitled to this additional treatment.  Ms. Sampson's fibromyalgia and the opinions of Drs. Pope and Mead complicated these issues with regard to the issue of penalties.  However, Ms. Sampson had been complaining of knee pain for approximately four years and had not seen an orthopedist for over sixteen months when Dr. Garcia recommended that the orthopedic consult be approved.

In making this determination, we are mindful that a claimant's burden of proof for the entitlement to benefits is different from an employer's defending the imposition of a penalty.  As stated above, an employer reasonably controverts a claim if it shows it had a valid reason for denying the claim.  On the other hand, a workers' compensation claimant need only prove by a preponderance of the evidence that requested medical treatment is reasonable and necessary.  *Vidrine v. Teche Elec. Supply, L.L.C.*, 08-1287 (La.App. 3 Cir. 4/1/09), 6 So.3d 1012, *writ denied*, 09-964 (La. 6/19/09), 10 So.3d 739.

### *Attorney Fees*

In its assignment of error on this issue, the APSB asserted the WCJ's award of attorney fees constituted reversible error because Ms. Sampson did not establish the time spent or the work done by her attorney in preparing and presenting her case.  Yet, it argues in brief only that the WCJ erred in awarding attorney fees because no penalties are warranted.  Accordingly, we consider the argument stated

in the assignment of error to be waived and address only the argument briefed. *See* Uniform Rules−Courts of Appeal, Rule 2-12.4.

We have determined two of the four penalties awarded were awarded erroneously and must be reversed. Accordingly, we proportionately reduce the attorney fees awarded to Ms. Sampson from $7,500 to $3,750. For work performed on appeal by Ms. Sampson's attorney, we award $2,500.

## DISPOSITION

The penalties awarded by the WCJ for the Avoyelles Parish School Board's refusal to authorize an MRI of Ms. Sampson's left knee and treatment by a second orthopedic surgeon are reversed, and the WCJ's award of attorney fees is amended from $7,500 to $3,750. The judgment of the WCJ is affirmed in all other respects. Attorney fees in the amount of $2,500 are awarded for work performed on appeal. Costs of this appeal are $633.75; each party is assessed one-half of this amount.

**AFFIRMED IN PART AS AMENDED; REVERSED IN PART; AND RENDERED.**